**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 0:20-cv-62302-KMM

SIGNIFY NORTH AMERICA
CORPORATION, *et al.*,

     Plaintiffs,

v.

ROBE LIGHTING INC., *et al.*,

     Defendants.

_____ /

**<u>MARKMAN ORDER</u>**

THIS CAUSE came before the Court upon Plaintiffs Signify North America Corporation and Signify Holdings B.V.'s (collectively, "Signify" or "Plaintiffs") opening claim construction brief regarding the following four U.S. Patents: (1) No. 6,478,453 (the "'453 Patent") (ECF No. 86-1); (2) No. 6,636,003 (the "'003 Patent") (ECF No. 86-4); (3) No. 7,806,558 (the "'558 Patent") (ECF No. 86-9); and (4) No. 7,557,521 (the "'521 Patent") (ECF No. 86-11). ("Opening Br.") (ECF No. 86). Defendants Robe Lighting Inc. and Robe Lighting s.r.o. (collectively, "Robe" or "Defendants") filed a responsive brief. ("Resp. Br.") (ECF No. 88). Plaintiffs filed a reply brief. ("Reply Br.") (ECF No. 95). The Court held a Tutorial and a *Markman* Hearing. (ECF Nos. 99, 100); ("Markman Hr'g Tr.") (ECF No. 122). The matter is now ripe for review.

## I.      BACKGROUND

This is a civil action for patent infringement arising under the Court's federal question jurisdiction pursuant to 28 U.S.C. § 1331 and the Court's patent jurisdiction pursuant to 28 U.S.C.

§ 1338.  The allegations are as follows.[1]

Plaintiffs develop and manufacture light-emitting diode ("LED") lighting solutions. Compl. ¶ 9.  They claim that Color Kinetics Inc. ("Color Kinetics"), which is now a part of Signify, and Defendants entered into a global licensing agreement that granted Defendants access to Color Kinetics's complete patent portfolio.  *Id.* ¶ 18.  This patent portfolio contains six U.S. Patents that are at issue in this action—the '453 Patent, '003 Patent, '558 Patent, '521 Patent, U.S. Patent No. 7,802,902 (the "'902 Patent"), and U.S. Patent No. 8,414,138 (the "'138 Patent") (collectively, the "Patents-in-Suit").  *Id.* ¶¶ 10–16.  Under the licensing agreement, Defendants paid Plaintiffs royalties in connection with the sale of LED products.  *Id.* ¶ 19.  The agreement, which expired in 2017, was not renewed.  *Id.* ¶ 20.

However, Plaintiffs claim that Defendants have infringed and continue to infringe the Patents-in-Suit by incorporating Plaintiffs' patented technologies into Defendants' products, and by marketing and selling previously licensed products without paying royalties.  *Id.*  Specifically, Plaintiffs allege that Defendants' following products infringe the Patents-in-Suit: the DL4S and DL7S products infringe the '453 Patent, *id.* ¶ 28; the DL4S, LEDBeam 150, Spiider, and Spikie products infringe the '003 Patent, *id.* ¶ 50; the DL4S, DL7S, and LEDBeam 150 products infringe the '521 Patent, *id.* ¶ 92; the DL4S, DL7S, LEDBeam 150, LEDBeam 100, Spiider, and Spikie products infringe the '902 Patent, *id.* ¶ 140; the LEDBeam 150 product infringes the '558 Patent, *id.* ¶ 184; and the DL7S product infringes the '138 Patent, *id.* ¶ 198.  Plaintiffs seek damages and injunctive relief.  *Id.* at 68.

The Parties filed their Updated Joint Claim Construction and Prehearing Statement.  *See generally* Updated Joint Claim Construction and Prehearing Statement ("Joint Statement") (ECF

---

[1] The following background facts are taken from the Complaint.  ("Compl.") (ECF No. 1).

No. 82).  Therein, the Parties identify eight patent claim terms with disputed constructions across four of the Patents-in-Suit.  *See generally id.*

## II.    LEGAL STANDARD

Courts construe the claims of a disputed patent.  *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 388–90 (1996).  "Claim construction begins with the words of the claims themselves."  *Allergan Sales, LLC v. Sandoz, Inc.*, 935 F.3d 1370, 1374 (Fed. Cir. 2019). Generally, the words of the claim are to be given their "ordinary and customary meaning," which is "the meaning the term would have to a person of ordinary skill in the art in question at the time of the invention."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005).  Alternatively, a court may determine that construction is unnecessary, but such a conclusion "may be inadequate when a term has more than one ordinary meaning or when reliance on a term's ordinary meaning does not resolve the parties' dispute."  *Eon Corp. IP Holdings v. Silver Spring Networks*, 815 F.3d 1314, 1318 (Fed. Cir. 2016) (internal quotation marks and citation omitted).

In construing the claims of a disputed patent, courts principally look to intrinsic evidence, which are the claims made in the patent, the specification, and the prosecution history.  *Alza Corp. v. Mylan Labs., Inc.*, 391 F.3d 1365, 1370 (Fed. Cir. 2004); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).  Claims must be read in view of the specification and the specification may act as a sort of dictionary, which explains the invention and may define terms used in the claims.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996).  "Usually, the specification is dispositive; it is the single best guide to the meaning of a disputed term."  *Edge Sys., LLC v. Venus Concept USA Inc.*, Case No. 18-62588-CIV-ALTMAN/Hunt, 2019 WL 3936379, at *1 (S.D. Fla. Aug. 20, 2019) (internal quotation marks omitted) (quoting *Vitronics Corp.*, 90 F.3d at 1582).  However, "there is

sometimes a fine line between reading a claim in light of the specification, and reading a limitation into the claim from the specification." *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998). Further, the prosecution history informs the meaning of the claim language by demonstrating how the patentee understood the invention. *Phillips*, 415 F.3d at 1317.

Courts may also rely on extrinsic evidence, which "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Id.* (quoting *Markman*, 52 F.3d at 980). Extrinsic evidence is less reliable than the patent and its prosecution history in determining how to read claim terms. *Id.* at 1318.

## III.   DISCUSSION

The Parties briefed eight terms for the Court to construe. They are: (1) "collimating element" / "collimating the light"; (2) "image-forming surface"; (3) "resultant light having a color temperature" / "the Color temperature of the resultant light"; (4) "adjustable/adjusted between about 2500 to about 5000 degrees Kelvin"; (5) "chip-on-board LED"; (6) "adjustable/adjusted to about 3600 degrees Kelvin"; (7) "chip-on-board assembly"; and (8) "controllably variable predetermined power." *See generally* Opening Br.; Resp. Br.; Reply Br.

The Court construes the disputed terms as follows.

### A.       '453 Patent

The '453 Patent relates to a "luminaire for projecting an image by means of a light beam." '453 Patent col. 1 l. 6–13. Signify is the assignee of the '453 Patent, entitled "Luminarie", through predecessor Philips Lighting. *Id.* at [54], [73]; Compl. ¶ 21. The patent application which matured into the '453 Patent was filed on January 3, 2001, and the United States Patent and Trademark Office ("USPTO") issued the '453 Patent on November 12, 2001. '453 Patent at [22], [45]. The Parties dispute the construction of the terms "collimating element" / "collimating the light" and

"image-forming surface" in Claim Thirteen of the '453 Patent, which reads as follows:

>   13.   A luminaire for projecting an image by a light beam, comprising:
>
>>   a housing having a light-emitting diode and an optical system for directing light generated by the light emitting diode,
>>
>>   an *image-forming surface* located along the light beam,
>>
>>   said optical system including a *collimating element* for *collimating the light* and a focusing lens for focusing the light and forming the light beam,
>>
>>   said collimating element being located between the light emitting diode and the image-forming surface, and
>>
>>   the light-emitting diode being mounted on a metal-core printed circuit board.

'453 Patent col. 7 l. 33 to col. 8 l. 2 (emphasis added).

### a.   "Collimating Element" / "Collimating the Light"

The Court begins by construing "collimating element" and "collimating the light."  The Parties propose the following constructions:

| Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|
| An optical device, such as a lens, that accepts incoming rays of light and outputs them as parallel, or nearly parallel, rays of light / outputting rays of light as parallel, or nearly parallel, rays | A lens that accepts incoming rays of light and outputs them as parallel rays of light / outputting the rays of light as parallel rays |

Joint Statement at 2–3.  The Parties' dispute centers on whether (1) a "collimating element" must be a lens or can encompass other devices, and (2) "collimating the light" requires that the light rays outputted by a collimating element be perfectly parallel, as opposed to nearly parallel.

In their Opening Brief, Plaintiffs argue that the intrinsic evidence for the '453 Patent does not define "collimating element" and "collimating the light," thus the Court must look to extrinsic evidence.  Opening Br. at 6–7.  To that end, Plaintiffs point the Court to engineering textbooks and

dictionaries defining a "collimator" as an "optical device" and a "lens or device," and which note that "LED collimators come in many configurations[.]"  *Id.* at 7 (quoting *Wiley Electrical & Electronics Dictionary* 122 (2004) (Ex. 7); *Fiber Optics Standard Dictionary* 38 (2nd ed., 1989) (Ex. 6); (*Fundamentals of Photonics* (3rd ed. 2019) (Ex. 5)).  Similarly citing to engineering textbooks and dictionaries, Plaintiffs argue that their proposed construction for "collimating the light" "reflect[s] the operational nature of collimators, namely that collimators output parallel, or *nearly* parallel rays of light." *Id.*

Defendants respond that the '453 Patent specification "repeatedly explain[s] that the collimating element of the alleged invention causes the light emitted to be a 'parallel light beam[.]'" Resp. Br. at 3–4.  Thus, Defendants argue that, because the specification is clear that a collimating element emits parallel light, as opposed to nearly parallel light, there is no need to resort to extrinsic evidence in construing "collimating the light." *Id.* at 4.  Defendants argue that, in any event, extrinsic evidence in the form of dictionaries from before the patent filing date do not support Plaintiffs' construction. *Id.*  As to the construction of "collimating element," Defendants contend that each of the embodiments in the '453 Patent specification "depict or describe the collimating element as a lens; different kinds of lenses, but all lenses." *Id.*  Defendants argue that the '453 Patent and the prosecution history do not contemplate that a collimating element is anything other than a lens. *Id.* at 4–5.

As to the term "collimating the light," Plaintiffs reply that nothing in the intrinsic evidence's use of "parallel" requires that all of the light rays be perfectly parallel.  Reply Br. at 1. Plaintiffs point to a diagram from the '453 Patent that they contend depicts light rays emitted from a collimating element that are minimally divergent and therefore not all or perfectly parallel. *Id.* (reproducing Figure 3-A of the '453 Patent).  According to Plaintiffs, the extrinsic evidence reveals

that their construction is more accurate as an operational matter, as no collimating element emits

perfectly parallel rays of light. *Id.* at 2. As to the term "collimating element," Plaintiffs argue that

Defendants' construction improperly limits the term to preferred embodiments. *Id.*

Starting first with the term "collimating element," the Court agrees that the term should not

be construed to be limited to only lenses. The Court first observes that Claim Thirteen

encompasses a "focusing lens for focusing the light" that is emitted by the "collimating element

for collimating the light." '453 Patent col. 7 l. 40–42. Throughout the specification, the '453

Patent refers to "focusing lenses" as being part of an same optical system with "collimating

elements." The specification does not define a collimating element as a lens, or as any particular

device for that matter. *See generally* '453 Patent. However, the specification does describe various

embodiments where the collimating element appears to take different forms, either embodied as a

lens or simply referred to as only a "collimating element." For example, the embodiment in

Figure 2-A, with its optical system enlarged in Figure 2-B, depicts a collimating *element* that is

combined or integrated with a focusing *lens* to form an integrated whole with both collimating and

focusing functions.[2] '453 Patent Fig. 2-B & col. 5 l. 39–43 (referring to the combined collimating

element and focusing lens as an "integrated element"). Figure 3-B depicts a collimating element

that is embodied as a specific type of lens—a Fresnel lens. '453 Patent Fig. 3-B & col. 6 l. 28–31.

And there are the Parties' competing proffers as to whether Figure 3-A depicts (1) a lens or (2) an

"optic" with both reflective and refractive properties.[3] *Compare* Markman Hr'g Tr. at 17:1–10,

---

[2]  Although Defendants proffered that this integrated device is a lens, the specification does not describe it as such. *See* Markman Hr'g Tr. at 31:4–6.

[3]  Example 1.2-1 in B.E.A. Saleh & M.C. Teich, *Fundamentals of Photonics* (2019) depicts a similar LED collimator and describes it as "an optic whose surface takes the form of a paraboloid of revolution" that has both reflective and refractive properties. (ECF No. 95-1) at 5.

*with id.* at 33:21–23; *see* '453 Patent Fig. 3-A & col. 6 l. 7–27.   This is all to say that the specification in the '453 Patent refers to collimating elements broadly, providing examples of embodiments that make use of collimating lenses and embodiments that refer to the device that collimates the light only as a "collimating element," consistent with Claim Thirteen.   That is, the patentee could have, but did not, claim an optical system comprising a "collimating lens."   The patentee's consistent and specific use of focusing *lenses* in Claim Thirteen and the specification supports such a finding.

The Court further rejects Defendant's argument that each of the embodiments in the '453 Patent specification depict collimating elements as lenses such that the term "collimating element" in Claim Thirteen is limited to only lenses.   *See Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1117 (Fed. Cir. 2004) ("[P]articular embodiments appearing in the written description will not be used to limit claim language that has broader effect.").

As to the term "collimating the light", the Court disagrees that the term should be construed as "outputting rays of light as parallel, or nearly parallel, rays."   Neither a plain reading of Claim Thirteen nor the '453 Patent specification support such a construction.   The purpose of the collimating element is to "cause[] the light emitted, in operation, by the light-emitting diode to become a parallel light beam."   '453 Patent col. 2 l. 59–61.   Further, in the context of the embodiment depicted in Figure 3-A and Figure 3-B, the specification references only parallel light. *See* '453 Patent col. 6 l. 1–41.   The intrinsic evidence does not support reading "nearly" into Claim Thirteen.   Further, the Court rejects Plaintiffs' argument that Figure 3-A in the '453 Patent depicts light rays emitted by a collimating element that are minimally divergent and therefore not perfectly or exactly parallel—that the diagram depicts a nearly parallel path for these light rays is by no means readily discernible upon visual inspection of Figure 3-A.   *See* '453 Patent Fig. 3-A.

Accordingly, the Court construes the term "collimating element" to mean "an optical device, such as a lens, that accepts incoming rays of light and outputs them as parallel rays of light." And the Court construes "collimating the light" to mean "outputting the rays of light as parallel rays."

### b. "Image-forming Surface"

Next, the Court construes the term "image-forming surface." The Parties propose the following constructions:

| Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| a GOBO, which is an object for selectively passing light | Plain and ordinary meaning |

Joint Statement at 4.

Plaintiffs argue that "image-forming surface" is not a term of art and is defined in the intrinsic evidence. Opening Br. at 8; Markman Hr'g Tr. at 38:20–21. They contend that the patentee acted as a lexicographer and defined "image-forming surface" to mean a "GOBO," which is an abbreviation used in the theater and movie industries for "GO BlackOut." *Id.* (citing '453 Patent col. 4 l. 44–46).

Defendants respond that the term should be afforded its plain and ordinary meaning as "simply a surface that forms images." Resp. Br. at 5. Defendants argue that the patentee's referring to an image-forming surface as a GOBO does not evidence an intent to limit the meaning of the term to GOBOs because the specification also explains that an image-forming surface can be something called a "Cookie." *Id.* at 6.

In reply, Plaintiffs assert that the specification twice refers to an image-forming surface as a GOBO. Reply Br. at 3. Plaintiffs further argue that the phrase "image-forming surface may also

comprise a so-called Cookie" comports with Plaintiffs' proffered construction because "comprise" is a term of art indicating open-ended inclusion. *Id.*

The Court agrees that the patentee acted as a lexicographer and defined the term "image-forming surface" in the '453 Patent specification. Here, in setting out the background of the invention, the patentee represented that "luminaires generally comprise a plurality of image-forming surfaces, *also referred to as GOBOs*. In an alternative embodiment, said GOBOs are mounted on rotatable, transparent sheets, so that each time a different GOBO is imaged by the luminaire." '453 Patent col. 1. l. 25–30 (emphasis added). Further, in describing Figure 2-A of the '453 Patent, which depicts a sectional view of a luminaire in accordance with the invention, the patentee again noted that:

> The image-forming surface 6 is alternatively referred to as GOBO (an abbreviation used in the theater and movie world: "GO BlackOut"). A GOBO generally consists of a thin metal sheet which serves as a mask for selectively passing light, or it may alternatively be made of (colored) glass provided with an image. The image forming surface 6 may also comprise a so-called Cookie (originating from the Greek word kukaloris), which causes light to be refracted. In general, a luminaire comprises a plurality of GOBOs mounted on rotatable transparent plates, and the luminaire images a different GOBO each time.

'453 Patent col. 4 l. 44–54. Accordingly, the Court accepts Plaintiffs' proposed construction of an image-forming surface as a GOBO, that being an object for selectively passing light. *See W.E. Hall Co. v. Atlanta Corrugating, LLC*, 370 F.3d 1343, 1353 (Fed. Cir. 2004) (observing that a claim term will not receive its ordinary and customary meaning when "the patentee has acted as his own lexicographer and clearly provided an alternate definition for the term"). The Court rejects Defendants' argument that "the image-forming surface can also be something other than a GOBO, including something called a Cookie." Resp. Br. at 6. Rather, the '453 Patent represents that a "Cookie" is a *type* of image-forming surface or GOBO.

Accordingly, the Court construes the term "image-forming surface" as a "GOBO, which is an object for selectively passing light."

**B.    '003 Patent**

The next Patent-in-Suit requiring construction is the '003 Patent.  The '003 Patent relates to a "semiconductor light emitting diode (LED) array" that is "adjustable by a user for the selection of a desired color temperature."  '003 Patent col. 1 l. 16–21.  The patent application that matured into the '003 Patent, claiming priority to a provisional patent application filed on September 6, 2000, was filed on September 6, 2001, and the USPTO issued the '003 Patent on October 21, 2003. '003 Patent at [22], [45], & col. 1 l. 9–13.  The '003 Patent bears the title "Apparatus and method for adjusting the color temperature of white semiconductor light emitters".  *Id.* at [54].  The '003 Patent claims the following in Claim One:

1.    A temperature adjustable LED arrangement comprising:

   at least one white LED;

   a first drive circuit operable to supply a first drive current to the at least one white LED such that a white light is output at a first intensity;

   at least one colored LED arranged such that a colored light is output from the at least one colored LED and combines with the white light to produce a *resultant light having a color temperature*, and

   a second drive circuit operable to supply a second drive current to the at least one colored LED such that the colored light is output at a second intensity, the second drive circuit being adjustable so as to adjust a level of the second drive current supplied so as to vary the color temperature of the resultant light; wherein *the color temperature of the resultant light is adjustable between about 2500 to about 5000 degrees Kelvin*.

'003 Patent col. 7 l. 55 to col. 8 l. 5 (emphasis added).  The Parties dispute the meaning of the

terms "resultant light having a color temperature" / "the color temperature of the resultant light" and "adjustable/adjusted between about 2500 to about 5000 degrees Kelvin" as used in various independent claims. They also dispute the meaning of "adjustable/adjusted to about 3600 degrees Kelvin", and "chip-on-board LED" in various dependent claims in the '003 Patent.

> **a. "Resultant Light Having a Color Temperature" / "The Color Temperature of the Resultant Light"**

The Parties propose the following constructions for the terms identified in the header above:

| Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| "resultant light" means combined light output<br><br>"color temperature" means the temperature, expressed in Kelvin [K], of an ideal black body radiator that radiates light of comparable hue to that of the light source | combined light output having a spectrum consistent with an ideal black-body radiator with an associated color temperature / the color temperature associated with the resultant light that has a spectrum consistent with an ideal black-body radiator |

Joint Statement at 5.

Plaintiffs argue that "resultant light" and "color temperature" take on their plain and ordinary meanings. Opening Br. at 11. Plaintiffs argue that their proposed construction for "color temperature" is taken directly from Defendants' extrinsic evidence. *Id.* at 12. However, Plaintiffs represent that they agreed the construction should reference "an ideal black body radiator" to narrow the issues for claim construction. *Id.* Plaintiffs also argue that Defendants' constructions are circular because they incorporate the disputed terms in the proposed constructions. *Id.* at 12–13. Moreover, Plaintiffs argue that Defendants' constructions assert that color temperatures have spectra, as opposed to hues, which is contrary to what Defendants' expert testified is the ordinary and customary meaning afforded to the term. *Id.* at 13. And Plaintiffs assert that

Defendants' publicly available technical datasheets for the products at issue refer to the "colo[]r temperatures" of the light output.  *Id.* at 14.

Defendants respond that the intrinsic evidence and prosecution history do not clarify the meaning of the disputed claim terms, thus the Court must look to extrinsic evidence.  Resp. Br. at 7.  Defendants argue that "color temperature" is a term of art.  *Id.* at 8.  According to Defendants, only light sources that emit light along a spectrum similar to that of a black body radiator (*e.g.*, the sun or incandescent lightbulbs) have a color temperature, but LEDs are not one of those kinds of light sources.  *Id.*  Thus, Defendants argue that LEDs have "correlated color temperatures," not "color temperatures," but here the disputed claim uses only the term "color temperature."  *Id.*  And Defendants argue that another Patent-in-Suit—the '558 Patent—uses a construction similar to what Defendants have proposed.  *Id.* at 9.

In reply, Plaintiffs argue that Defendants fail to address that Plaintiffs' proposed constructions are taken directly from Defendants' extrinsic evidence, and that Defendants' expert agrees with those definitions.  Reply Br. at 4.  Plaintiffs argue that Defendants also neglect that the '558 Patent states "for purposes of this disclosure, the term 'color' is used interchangeably with the term 'spectrum.'"  *Id.*  Thus, Plaintiffs contend that when the '558 Patent uses the phrase "essentially the same spectrum," it means "essentially the same color."  *Id.*

The Parties appear to agree that "resultant light" means "combined light output."  They also agree that the construction of "color temperature" should refer to "an ideal black body radiator."  However, the Parties disagree whether the construction of "color temperature" should reference "hue" or "spectrum," in addition to whether "color temperature" even applies to LEDs.

First, the Court accepts the Parties' agreed construction for "resultant light."  Accordingly, the term "resultant light" shall be construed as "combined light output."

Second, the Court rejects Defendants' proposed constructions for the remainder of the disputed terms. At first blush, it appears clear that the Parties dispute the meaning and applicability of the term "color temperature." According to Defendants, that term as used in Claim One of the '003 Patent for "resultant light having a color temperature" means "combined light output having a spectrum consistent with an ideal black-body radiator with an associated color temperature." Joint Statement at 5. Likewise, Defendants define the phrase "the color temperature of the resultant light" as "the color temperature associated with the [combined light output] that has a spectrum consistent with an ideal black-body radiator." *Id.* To the extent the meaning of "color temperature" is genuinely disputed, Defendants' proposed constructions are circular because they incorporate the term to be defined into the definition. Such constructions are both unhelpful and improper. *See Univ. of Fla. Rsch. Found. v. Motorola Mobility, LLC*, 3 F. Supp. 3d 1374, 1377 (S.D. Fla. 2014) (citing *ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1090 (Fed. Cir. 2003)) ("The use of circular reasoning constitutes improper claim construction.").

If Defendants do not genuinely dispute the meaning of "color temperature," their use of the term in their definition for the disputed phrase suggests that a plain and ordinary meaning for "color temperature" should apply, which was Plaintiffs' original position at the beginning of this claim construction process. *See* Opening Br. at 12 (citing (ECF No. 75) at 5). To that end, Defendants' proposed constructions improperly construe new elements into Claim One without clarifying the meaning of the term that appears to be at issue. If Defendants' argument is that their allegedly infringing products do not *have* color temperatures, that argument is not relevant at this stage of the proceedings. Further still, if Defendants' argument is both that their products do not have color temperatures and the meaning of "color temperature" requires construction, then their proposed constructions, again, are circular and improper as noted above.

Moreover, and putting aside the implication of Defendants' construction,[4] adopting Defendants' construction is inconsistent with the intent of the patentee, as demonstrated by the '003 Patent specification. Here, Defendants argue that LED lights cannot, as a technical matter, have a color temperature. *See* Resp. Br. at 8–9 (arguing that LEDs are assigned *correlated* color temperatures); Markman Hr'g Tr. 54:3–9, 54:22–24. But the '003 Patent specification clearly evidences an intent to apply general principles of color temperature to the light emitted by LED arrays—that is, a means of measuring the perceived hue of the emitted light—notwithstanding the patentee's apparent recognition that LEDs produce light "along a narrow wavelength band." *See* '003 Patent col. 1 l. 29–32, 51–54 ("This temperature scale is also used to measure the light output of other light sources, such as incandescent bulbs, fluorescent lamps and LEDs, to name a few."). To that end, the '003 Patent specification discusses principles of color temperature, expressed in degrees Kelvin, when describing the prior art involving LEDs. *See* '003 Patent col 2 l. 20–26. The Court also observes that the purpose of the patentee's invention is to afford a user the ability to adjust how "warm"/red or "cold"/blue the light output for an LED array appears: "In particular, the present invention relates to a semiconductor LED array which is adjustable by a user for the selection of a desired color temperature. In addition, the present invention relates to a method of selecting a desired color temperature from an array of LEDs." '003 Patent col 1 l. 17–21; *see also id.* at col. 2 l. 3–29 (concluding that "there remains a need for a white light LED which is simple and can be easily adjusted to produce a white light of a desired color temperature"); *SuperGuide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 895–96 (Fed. Cir. 2004) (considering the invention's purpose in construing the claim terms). And in any event, Plaintiffs' definition for color

---

[4] That being that the '003 Patent does not cover the *patentee's* invention, let alone the alleged infringing products.

temperature is drawn directly from Defendants' extrinsic evidence.  *Compare* Opening Br. at 12

(quoting *What is Color Temperature in LED Lighting*, ENELTEC https://www.eneltec-led.com/news/what-is-color-temperature-in-led-lighting.html), *with* Joint Statement at 6.

Based on the foregoing, the Court adopts Plaintiffs' proposed constructions.  Accordingly,

(1) "resultant light" shall be construed as "combined light output," and (2) "color temperature"

shall be construed as "the temperature, expressed in Kelvin [K], of an ideal black body radiator

that radiates light of comparable hue to that of the light source."

### a. "Adjustable / Adjusted Between About 2500 to About 5000 Degrees Kelvin" and "Adjustable / Adjusted to About 3600 Degrees Kelvin"

Next, the Parties dispute the meaning of "adjustable / adjusted between about 2500 to about

5000 degrees Kelvin" in independent Claims One, Twenty, and Thirty-Four of the '003 Patent.

They propose the following constructions:

| Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| Plain and ordinary meaning | adjustable/adjusted between about 2500 degrees Kelvin, but not lower, to about 5000 degrees Kelvin, but not higher |

Joint Statement at 7.  Relatedly, the Parties dispute the construction of the phrase "adjustable /

adjusted to about 3600 degrees Kelvin" in dependent Claims Nineteen, Twenty-One, and

Thirty Seven.  *Id.* at 9.  The Parties propose the following constructions:

| Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| Plain and ordinary meaning | Adjustable/adjusted between about 3600 degrees Kelvin, but not higher |

Joint Statement at 9.

Plaintiffs argue the disputed terms identified above take on their plain and ordinary

meaning because the claim terms are ordinary, simple English words.  Opening Br. at 14, 19;

Markman Hr'g Tr. at 60:18–22.  According to Plaintiffs, the purpose of these disputed claim terms

is "to provide the adjustment capability between about 2500 to about 5000 degrees Kelvin." *Id.* at 16. Plaintiffs assert that claim terms ending in an "-able" suffix are "directed to the *capability* of an invention," thus the plain language of the claim terms, as confirmed by the specification, "only requires the functionality of allowing the color temperature of the light output to be adjustable/adjusted between about 2500 to about 5000 degrees Kelvin, but does not exclude being adjustable/adjusted to other color temperatures." *Id.* at 17 (citing *Intel Corp. v. U.S. Int'l Trade Comm'n*, 946 F.2d 821, 832 (Fed. Cir. 1991)). To that end, Plaintiffs argue that Defendants' proposed constructions arbitrarily read a floor and ceiling into the claims, which is unsupported by the specification, prosecution history, and claim language. *Id.* Moreover, Plaintiffs argue that use of the word "compromising" in Claims One, Twenty, and Thirty-Four renders the claims open-ended in scope, such that they do not exclude color temperatures below 2500 and above 5000 degrees Kelvin. *Id.* at 18. Plaintiffs also argue that the qualifier "about" does not limit the end points of the ranges to the exact end points. *Id.* As to the color temperature of 3600 degrees Kelvin, Plaintiffs argue that Defendants' proposed construction is nonsensical in its use of "between" and, otherwise, the claim term adds a further requirement of an exemplary setting when read in the context of the independent claims. *Id.* at 19.

In response, Defendants argue that construction of the disputed phrase in the independent claims is needed because of dependent Claims Nineteen, Twenty-One, Thirty-Three, and Thirty-Seven, which add the further requirement that the color temperature be adjustable "to about 3600 degrees Kelvin." Resp. Br. at 9–10, 12. According to Defendants, dependent Claim Nineteen, for example, is broader than independent Claim One because Plaintiffs' construction could result in products that infringe the dependent claim without infringing the independent claim. *Id.* at 10–11 (discussing a hypothetical example product that is adjustable between about 2500 to

about 4000 degrees Kelvin). Defendants argue the same issue arises as between (1) Claims Twenty and Twenty-One, (2) Claims Twenty-Two and Twenty-Three, and (3) Claims Thirty-Four and Thirty-Seven. *Id.* at 11. Defendants assert that an LED arrangement "allowing the color temperature to be adjusted from about 2500 to about 5000 degrees must necessarily also be able to adjust to about 3600 degrees, which is in the middle of that range." *Id.* at 12.

Plaintiffs reiterate that dependent Claim Nineteen is an exemplary setting adding a further requirement for an LED arrangement capable of being set to a color temperature of about 2500 to about 5000 degrees Kelvin, that the LED arrangement also be adjustable to about 3600 degrees Kelvin. Reply Br. at 5. Plaintiffs note that a preferred embodiment identified in the '003 Patent specification confirms that 3600 degrees Kelvin is an exemplary setting. *Id.* at 6 (citing '003 Patent col. 7 l. 13–15). Plaintiffs also argue that Defendants' example of an LED arrangement adjustable to 4000 degrees Kelvin but not 5000 degrees Kelvin does not represent a situation where the independent claim is not infringed but the dependent claim is infringed, because a dependent claim can only be infringed if the related independent claim is infringed. *Id.* at 6 (citing *Wahpeton Canvas Co. v. Frontier, Inc.*, 870 F.2d 1546, 1553 (Fed. Cir. 1989)).

The Court rejects Defendants' proposed constructions because they are incoherent and unhelpful. It is not clear how a range can be both "about" a floor but not lower than that floor and up to "about" a ceiling but not higher than that ceiling such that the construction "retain[s] that little bit of flexibility, around 2500," for example. Markman Hr'g Tr. at 71:24–25. Whatever their attempt to retain flexibility, Defendants' constructions convert "adjustable / adjusted between about 2500 to about 5000 degrees kelvin" to "adjustable / adjusted between not less than 2500 to not more than 5000 degrees kelvin," and thus would read language out of the claims. However, the patentee's use of "about" and "comprising" indicates an intent not to limit the claimed ranges

to their exact endpoints.  *See Vehicular Techs. Corp. v. Titan Wheel Int'l, Inc.*, 212 F.3d 1377, 1383 (Fed. Cir. 2000) ("A drafter uses the term 'comprising' to mean 'I claim at least what follows and potentially more.'"); *Loftex USA LLC v. Trident Ltd.*, 957 F. Supp. 2d 375, 386 (S.D.N.Y. 2013) (quoting *In re Harris*, 409 F.3d 1339, 1343 (Fed. Cir. 2005)).  The Court agrees that the plain language of the '003 Patent claims an LED arrangement that is capable of being adjusted from about 2500 degrees Kelvin to about 5000 degrees Kelvin, with 3600 degrees Kelvin being an exemplary setting.  *See* '003 Patent col. 7 l. 13–15 (describing a preferred embodiment in which the color temperature of the white light is "set to about 3600 degrees Kelvin").

Accordingly, these terms shall be construed according to their plain and ordinary meaning.

**b.  "Chip-on-Board LED"**

The last term requiring construction in the '003 Patent is "chip-on-board LED".  Plaintiffs' Opening Brief did not delineate Plaintiffs' arguments with respect to the term "chip-on-board LED" in the '003 Patent and the term "chip-on-board assembly" in the '558 Patent because the Parties had, initially, proposed the same competing constructions for those terms across both patents.  Thus, Plaintiffs' arguments for "chip-on-board LED" were tied to Plaintiffs' arguments for "chip-on-board assembly" in the '558 Patent.  Defendants later amended their proposed construction for "chip-on-board assembly" in the '558 Patent in response to arguments Plaintiffs advanced in their Opening Brief.  *See* Resp. Br. at 18–19.  Defendants also noted that the '003 Patent application was filed six years before the '558 Patent application, thus "that is the date from which the claim must be interpreted" for the '003 Patent.  Resp. Br. at 13.

The Court agrees that "chip-on-board LED" in the '003 Patent must be construed separately from the term "chip-on-board assembly" in the '558 Patent because, although filed in the same or closely related fields, the two patents were filed more than six years apart and reference different

intrinsic evidence. *See Phillips*, 415 F.3d at 1313 ("[O]rdinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, *i.e.*, as of the effective filing date of the patent application."). The construction of "chip-on-board LED" cannot rely on intrinsic evidence in the '558 Patent to the extent that evidence did not arise until after the '003 Patent application was filed.

The Court begins with the Parties' proposed constructions for "chip-on-board LED" in the '003 Patent, which are as follows:

| Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| One or more semiconductor chips in which one or more LED junctions are fabricated, the chips being mounted and wire bonded to a printed circuit board | An LED that is mounted and wire bonded directly on its printed circuit board,[5] and covered by a glob of epoxy or epoxy-like material |

Opening Br. at 20; Resp. Br. at 12. The Parties dispute whether a "chip-on-board LED" contains a single or multiple LEDs, and whether that chip must be covered by a glob of epoxy or epoxy-like material.

Defendants argue that "chip-on-board LED" is a term of art in electronics and that at the time of the '003 Patent invention, the manufacturing process for a chip-on-board device was known to comprise "mounting and wire bonding a semiconductor onto a printed circuit board, and then encapsulating the 'chip' with a glob of encapsulant." Resp. Br. at 12–13. According to

---

[5]   In the Parties' Updated Joint Claim Construction and Prehearing Statement, Defendants' proposed construction included the phrase "final printed circuit board." Joint Statement at 7. And Defendants' responsive brief represents that the Parties dispute whether a "chip-on-board LED" requires mounting on a "final" printed circuit board. Resp. Br. at 13. However, the proposed construction in Defendants' responsive brief does not include the word "final." *Id.* at 12. Nor does Defendants' brief discuss this aspect of Defendants' proposed construction for "chip-on-board LED" in the '003 Patent. *See id.* at 12–18. At the *Markman* Hearing, Defendants also characterized the Parties' competing constructions as involving only two disputes. *See* Markman Hr'g Tr. at 82:22. Accordingly, Defendants appear to have abandoned this aspect of the dispute and their proposed construction.

Defendants, references to LEDs in the '003 Patent "are discussed as being a single LED chip," and "chip-on-board" is referenced only twice and in passing. *Id.* at 14. Defendants also argue that the '003 Patent does not distinguish between "discrete LEDs"—a term the Parties agree means "single self-contained LED die"—and "chip-on-board devices." *Id.* Thus, Defendants assert that, necessarily, a chip-on-board LED must contain a single LED die. *Id.* And Defendants argue that all embodiments described in the '003 Patent contemplate a single LED. *Id.* at 14–15. Pointing to extrinsic evidence, Defendants further assert that, at the time of the '003 Patent application, "chip-on-board" referred to a single LED mounted directly to a printed circuit board, and then covered with a glob of epoxy. *Id.* at 15–16. According to Defendants, the extrinsic evidence identifies that encapsulation with epoxy is "the key" to chip-on-board operation and an essential step in the assembly process. *Id.* at 16–17.

In their Reply Brief, Plaintiffs assert that the '003 Patent does not limit an LED to a single semiconductor chip. Reply Br. at 7. Plaintiffs emphasize that, as Defendants recognize, "chip-on-board" is only mentioned twice in passing in the '003 Patent. *Id.* Plaintiffs further argue that Defendants' construction illogically equates "discrete LEDs" with "chip-on-board LEDs." *Id.* As to Defendants' proposed inclusion of "glob of epoxy" in their construction, Plaintiffs observe that Defendants have broadened their proposed construction from "glob of epoxy" to "glob of epoxy or epoxy-like material," however, Plaintiffs continue to link their arguments in opposition to this construction in the '003 Patent to their arguments in opposition to this construction in the later-filed '558 Patent. *Id.*

The '003 Patent specification uses the term "chip-on-board" in two places. First, in the summary of the invention, the '003 Patent specification states, "In the preferred embodiments, the colored LEDs are either amber LEDs, or a combination of red and yellow LEDs. The LEDs used

can be either discrete LEDs or 'chip-on-board' LEDs." '003 Patent col. 2 l. 47–50. Later, in the detailed description of embodiments of the invention, the '003 Patent specification describes that, "In FIGS. 1A through 3B, circles represent cylindrical, or discrete LEDs and rectangles represent surface mount devices, or chip-on-board devices." *Id.* at col. 3 l. 34–36.

To begin, the Court rejects Defendants' argument that a lack of discussion regarding the distinctions between the components of "discrete LEDs" and "chip-on-board LEDs" in the specification necessarily requires that both "discrete LEDs" and "chip-on-board LEDs" comprise a single LED die. Rather, the use of disjunctives in the summary of the invention (*i.e.*, that "The LEDs can be *either* discrete LEDs *or* 'chip-on-board LEDs'") implies that a chip-on-board LED should be understood as something other than a "single self-contained LED die."

However, the references above are made in passing and the intrinsic evidence is otherwise ambiguous regarding the construction of "chip-on-board LED." Returning to the claims themselves, dependent Claim Thirteen in the '003 Patent asserts that "*the at least one white LED is a* chip-on-board LED." '003 Patent col. 8 l. 38–39 (emphasis added). And dependent Claim Fourteen adds the further requirement that "the at least one white LED comprises at least two white LEDs *arranged in series*." '003 Patent col. 8 l. 40–42 (emphasis added); *see also id.* at l. 10–14, 48–52 ("the at least one colored LED" comprises "at least two colored LEDs arranged in series"). When read in the context of the specification's depiction of chip-on-board LEDs with one color per chip, arranged in series, *see* '003 Patent col. 4 l. 54–59 & Figs. 3-A, 3-B, the claims and specification appear to contemplate that "chip-on-board LED" refers to a single LED per chip, as opposed to multiple LEDs per chip, with the single-LED chip-on-board LEDs arranged in series. But neither the claims nor the specification unambiguously foreclose the possibility that a chip-on-board LED could contain more than one LED of the same color (*e.g.*, that a white

chip-on-board LED cannot contain more than one phosphor-coated, high-intensity blue LED dies). Thus, the Court will look to the extrinsic evidence.[6] *See Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1382 (Fed. Cir. 2008).

As set forth in the Parties' Updated Joint Claim Construction and Prehearing Statement, Plaintiffs' extrinsic evidence consists entirely of materials from after the issuance of the '003 Patent. Joint Statement at 7. The Court rejects that extrinsic evidence for the reasons stated above. The Court accepts the testimony of Defendants' expert, Dr. Alfred Ducharme, who opined that, "[a]t the time of the invention of the '003 patent, the 2000 time frame, chip-on-board only referred to a single LED mounted directly to printed circuit board, wire bonded, and then covered with a blob -- a blob of epoxy." Deposition of Alfred Ducharme ("Ducharme Dep. Tr.") (ECF No. 88-9) at 123:17–22; *see also* Declaration of Alfred Ducharme ("Ducharme Decl.") (ECF No. 88-5) ¶ 31. Accordingly, "chip-on-board LED" in the '003 Patent shall be construed to refer to a single LED, as opposed to multiple LEDs, per chip.

The Court must also look to extrinsic evidence to determine whether "chip-on-board LED" should be understood to require encapsulation by epoxy or an epoxy-like material. The '003 Patent contains no indication as to whether a chip-on-board LED must be encapsulated and, if so, by what material or means. Therefore, the Court must look to the extrinsic evidence. Defendants' extrinsic evidence from before the issuance of the '003 Patent persuasively sets forth that a chip-on-board

---

[6] The Court also notes that the '003 Patent reflects that the examiner cited to a 1998 U.S. patent. '003 Patent at [56] (citing U.S. Patent No. 5,803,579). This 1998 patent includes a more detailed description of "chip-on-board" LEDs and appears to suggest that a chip-on-board LED contemplates a single LED die. *See* U.S. Patent No. 5,803,579 col. 11 l. 59 to col. 12 l. 5. However, neither Party points to the prosecution history of the '003 Patent for construction of the term "chip-on-board LED", and the '003 Patent's prosecution history is not in evidence. *See Phillips*, 415 F.3d at 1317 ("In addition to consulting the specification, we have held that a court 'should also consider the patent's prosecution history, *if it is in evidence*.'" (emphasis added))

LED must be encapsulated upon mounting to the printed circuit board.  *See* Ducharme Decl. ¶ 33; Guy Rabilloud, *High-Peformance Polymers Chemistry & Applications* 8–9 (2000); C.P. Wong *et al.*, *Chip on Board Encapsulation in* CHIP ON BOARD TECHNOLOGIES FOR MULTICHIP MODULES 470, 474–83 (John H. Lau ed., 1994) (identifying various types of encapsulants).  However, Defendants' expert explained that the encapsulating material need not be epoxy, *see* Ducharme Dep. Tr. at 120:2–11 (ECF No. 95-4) at 14, and, in any event, the term "glob" is imprecise.

Accordingly, a "chip-on-board LED" in the '003 Patent shall be construed as "an LED that is mounted and wire bonded directly to a printed circuit board, and covered by an encapsulant."

### C.     '558 Patent: "Chip-on-board Assembly"

The next term requiring construction is "chip-on-board assembly."  This term is found in the '558 Patent, which is entitled "Methods and Apparatus for Providing Uniform Projection Lighting."  '558 Patent at [54].  The '558 Patent relates to "projection lighting fixtures and methods for arranging light sources and optical structures within such fixtures to provide substantially uniform projection lighting."  '558 Patent col. 1 l. 16–19.  The patent application which matured into the '558 Patent was filed on November 7, 2007, and the USPTO issued the '558 Patent on October 5, 2010.  '453 Patent at [22], [45].  The disputed term "chip-on-board assembly" is found in Claim One of the '558 Patent, which states as follows:

1.     A lighting apparatus, comprising:

> an essentially planar mounting board having a first reference axis in a first plane defined by the mounting board; and

> a plurality of LED-based light sources disposed on the mounting board, each light source comprising an LED package including a *chip-on-board assembly* of multiple LED chips and a collimator coupled to the LED package, each light source having a second reference axis indicating an orientation of the light source, the second reference axis for each light source being designated identically for all light sources of the plurality of light sources, wherein the plurality of

> LED-based light sources are disposed on the mounting board such that a first orientation of a first light source of the plurality of light sources, relative to the first reference axis of the mounting board, is different from at least one other orientation of at least one other light source of the plurality of light sources relative to the first reference axis of the mounting board.

'558 Patent co. 12 l. 2–21 (emphasis added).

Unlike the term "chip-on-board LED" in the '003 Patent, the Parties agree that a "chip-on-board assembly" can contain more than one LED.  The Parties propose the following constructions:

| Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|
| One or more semiconductor chips in which one or more LED junctions are fabricated, the chips being mounted and wire bonded to a printed circuit board | One or more LEDs that are mounted and wire bonded directly on a printed circuit board, and covered by a glob of epoxy or epoxy-like material |

Opening Br. at 22; Resp. Br. at 18.

The Parties' constructions differ only as to whether a chip-on-board assembly must be encapsulated.  According to Plaintiffs, their proposed construction adheres to the definition of "chip-on-board assembly" set forth in the '558 Patent.  Opening Br. at 22–23.  Plaintiffs also argue that the '558 Patent specification provides that a glob of epoxy or plastic "may" be used to cover the chip and wire connection, and Defendants' proposed construction reads a limitation from the written description into the claims.  *Id.* at 23 (quoting '558 Patent col. 1 l. 44–47).  Plaintiffs contend that the '558 Patent discloses an example chip-on-board assembly for which the product datasheet depicts an assembly not covered by a glob of epoxy (the "OSTAR Datasheet"), thus Plaintiffs argue that Defendants' proposed construction would exclude an embodiment disclosed in the specification.  *Id.* at 23–24; (ECF No. 86-21) at 1 (depicting a chip-on-board assembly without a glob of epoxy).

Upon review of Plaintiffs' arguments, Defendants amended their proposed constructions such that the dispute now centers only on whether a chip-on-board assembly must be covered by a glob of epoxy or epoxy-like material. Resp. Br. at 18–19. To that end, Defendants argue that the permissive language Plaintiffs reference—that the chip-on-board assembly "may" be covered in epoxy or plastic—is drawn from an explanatory background section of the '558 Patent specification and is not an attempt by the patentee to act as a lexicographer and provide a definition for the term "chip-on-board assembly." *Id.* at 19–21. Rather, as they did with respect to the '003 Patent Defendants argue that epoxy encapsulation is "one of the hallmarks of chip-on-board construction" that one of ordinary skill in the art would know is not optional. *Id.* at 19. Further, Defendants take issue with the OSTAR Datasheet to which Plaintiffs point. *See id.* at 21. Specifically, in a side-by-side German-to-English translation, the OSTAR Datasheet renders the word "planvergossen" as "planar sealed," whereas Defendants contend that Google Translate renders that word as "encapsulated." *Id.* Further, Defendants argue that a January 2014 Application OSTAR Datasheet product describes that the product is "equipped with a clear silicone encapsulant." *Id.* (quoting (ECF No. 88-16)).

In reply, Plaintiffs reiterate that "chip-on-board LED assembly" is defined identically in two different places within the '558 Patent specification. *Id.* Plaintiffs argue that Defendants' proposed construction requires a feature that the '588 Patent mentions only once and identifies as optional. *Id.* And, Plaintiffs observe that the extrinsic evidence, namely engineering dictionaries, do not mention encapsulation when defining "chip-on-board." *Id.* at 8–9. Last, Plaintiffs argue that Defendants' reliance on Google Translate is misplaced and the OSTAR Datasheet provides a side-by-side German-to-English translation of the word in question as "planar sealed", which means a flat surface, not a raised "glob of epoxy." *Id.* at 9.

Plaintiffs persuasively argue that the '558 Patent discloses two descriptions of chip-on-board LED assemblies. The first description, although provided in the background section of the '558 Patent specification, recognizes that chip-on-board assemblies *may* be covered by epoxy or plastic:

> A "chip-on-board" (COB) LED assembly refers generally to one or more semiconductor chips (or "dies") in which one or more LED junctions are fabricated, wherein the chip(s) is/are mounted (e.g., adhered) directly to a printed circuit board (PCB). The chip(s) is/are then wire bonded to the PCB, after which a glob of epoxy or plastic *may be used* to cover the chip(s) and wire connections.

'558 Patent col. 1 l. 40–47 (emphasis added). The second description, provided in a detailed description of one of the embodiments of the invention, makes no mention of encapsulation by epoxy or any other material:

> In one aspect of this embodiment, each of the light sources 301 may comprise an "LED package," e.g., a chip-on-board LED assembly including one or more semiconductor chips (or "dies') in which one or more LED junctions are fabricated, wherein the chip(s) is/are mounted (e.g., adhered) directly to a printed circuit board (PCB).

'558 Patent col. 7 l. 10–16. The Court agrees that Defendants' construction requires a feature—encapsulation with a glob of epoxy—that the patent either does not unambiguously require, or which the patent otherwise generally recognizes as optional. The Court rejects Defendants' use of Google Translate to contradict the side-by-side German-to-English translation provided in the OSTAR Datasheet. *See* '558 Patent col. 7 l. 45–48; (ECF No. 86-21) at 2. The Court has reviewed the OSTAR Datasheet and January 2014 Application note. Neither depicts a product with a raised "glob" of epoxy. To the extent "planvergossen" or "planar sealed" evidences a requirement of encapsulation, it appears the encapsulation is achieved via flat and clear materials, as opposed to raised globs of epoxy. The foregoing findings do not contradict the '558 Patent's recognition that "a glob of epoxy or plastic may be used." '558 Patent col. 1 l. 40–47. And as

noted above, Defendants' expert explained that the encapsulating material need not be epoxy.  *See*
Ducharme Dep. Tr. at 120:2–11 (ECF No. 95-4) at 14.

Accordingly, the term "chip-on-board assembly" shall be construed to mean "one or more
semiconductor chips in which one or more LED junctions are fabricated, the chips being mounted
and wire bonded to a printed circuit board."

### D.  '521 Patent: "Controllably Variable Predetermined Power"

The last term requiring construction is "controllably variable predetermined power" in the
'521 Patent, which bears the title "LED power control methods and apparatus."  '521 Patent
at [54].  The '521 Patent relates to a "controlling power delivered to a load" where in some
examples "a controlled predetermined power is provided to a load without requiring any feedback
from the load (e.g., without monitoring load voltage and current) and/or regulation of load voltage
or load current."  '521 Patent col. 1 l. 15–20.  The patent application that matured into the
'521 Patent was filed on March 5, 2005, and the USPTO issued the '521 Patent on July 7, 2009.
'521 Patent at [22], [45].  The Parties propose the following constructions for the disputed phrase:

| Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| An amount of power that is determined before it is applied, and can be adjusted and controlled. | Adjustable amount of power that is determined from the circuit's parameters before the circuit is energized without using feedback. |

Joint Statement at 11.  The Parties agree this term is not a term of art and that it is not defined in
the '521 Patent specification.  *See* Opening Br. at 27; Resp. Br. at 25; *see generally* '521 Patent.

Plaintiffs argue that the plain and ordinary meaning of the term can be ascertained from
extrinsic evidence, such as engineering dictionaries.  Opening Br. at 27–28 (providing definitions
for "controllable," "control," "variable," and "predetermine").   According to Plaintiffs,
Defendants' construction is ambiguous as to what "circuit" refers to—*i.e.*, all the electronics in the

luminaire device, or only the LEDs.  *Id.* at 28 (explaining that, if "circuits" refers to all the electronics in the luminaire device, multiple embodiments would be excluded from the claims). Plaintiffs also assert that including "without using feedback" in the construction of the disputed claim term would render multiple claims redundant under the doctrine of claim differentiation, and relatedly, read a limitation into Claims Twenty-Three and Thirty-Three.  *Id.* at 29–29.  Moreover, Plaintiffs contend that Defendants' proposed construction would read a limitation of "feed-forward" described in a preferred embodiment into the claims.  *Id.* at 30.

Defendants respond that the term "controllably variable predetermined power" is used four times in the detailed description of the embodiments section of the '521 Patent specification, each time referring to embodiments that do not require feedback information from the LED load.  Resp. Br. at 25.  Defendants further argue that Plaintiffs' proposed construction disregards the word "predetermined" because their construction permits feedback monitoring and thus the power is not "predetermined."  *Id.* at 26.  Moreover, Defendants point to the '521 Patent prosecution history as evidence of the patentee's intent that power "be predetermined prior to being provided to the LEDs and then delivering this predetermined power to the LEDs, without having to obtain feedback from the LEDs afterwards."  *Id.* at 27.  According to Defendants, Plaintiffs' proposed construction collapses into "desired power," which, alongside "predetermined desired power," is used throughout the specification without ever being equated to "predetermined power."  *Id.*  Last, Defendants argue that the doctrine of claim differentiation is inapplicable considering the foregoing.  *Id.* at 28–29.

In reply, Plaintiffs reiterate that Defendants' proposed construction runs afoul of the doctrine of claim differentiation.  Reply Br. at 9–10.  According to Plaintiffs, Defendants admit that there is no definitional language in the specification that would support reading "without

requiring any feedback information" into the independent claims. *Id.* at 10. Plaintiffs further argue that Defendants incorrectly conflate "predetermined power" and "without using feedback", as whether feedback is used to adjust power does not affect whether the power is predetermined. *Id.* Finally, Plaintiffs argue that the prosecution history does not support Defendants' arguments. *Id.*

The Court rejects Defendants' proposed construction and adopts Plaintiffs' proposed construction. First, Defendants' proposed construction violates the doctrine of claim differentiation. "In the most specific sense, 'claim differentiation' refers to the presumption that an independent claim should not be construed as requiring a limitation added by a dependent claim." *Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1380 (Fed. Cir. 2006). Here, it cannot be genuinely disputed that Defendants' proposed construction reads the further requirement of "without requiring feedback" in dependent Claims Twenty-Four and Thirty-Four into independent Claims Twenty-Three and Thirty-Three, respectively. While the Federal Circuit has explained that the doctrine of claim differentiation's "presumption is not a hard and fast rule and will be overcome by a contrary construction dictated by the written description or prosecution history," Defendants fail to meaningfully rebut the presumption in their responsive brief, only addressing the argument in passing. *See Seachange Int'l, Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1369 (Fed. Cir. 2005). Moreover, the Court agrees that the prosecution history related to "predetermined power" fails to rebut this presumption for the reasons stated in Plaintiffs' Reply Brief. *See* (ECF No. 88-16); Reply Br. at 10. Nor, for the reasons stated below, is the presumption rebutted by the written description in the '521 Patent specification.

Specifically, the Court agrees that Defendants' proposed construction improperly reads a limitation from the embodiments into the claims. *See* '521 Patent col. 13 l. 26–60 (summarizing four embodiments, two of which provide "a first controllably variable predetermined power to the

at least one first LED without requiring any feedback," and two of which do not preclude feedback); *see also id.* at col. 49 l. 28–33 ("While several embodiments discussed above generally relate to 'feed-forward' power control apparatus, *according to other embodiments various power control apparatus may be implemented which incorporate some type of feedback relating to the load*, while nonetheless providing streamlined and power efficient circuit solutions." (emphasis added)). The '521 Patent specification acknowledges that only some of the embodiments described in the specification are feed-forward, as opposed to feedback, driven:

> [T]he present disclosure is directed generally to various improved methods and apparatus for providing and controlling power to at least some types of loads. *In some embodiments discussed further below*, a controlled predetermined power is provided to a load without requiring any feedback information from the load (e.g., without monitoring and/or regulation of load voltage and current), thereby significantly reducing circuit complexity, number of components, size and efficiency.

'521 Patent col. 21 l. 14–22 (emphasis added); *see also id.* at col. 25 l. 15–27 ("In some embodiments discussed further below . . . ."). Thus, the Court rejects Defendants' proposed construction to the extent it reads limitations into the claims, especially where that proposed construction violates the doctrine of claim differentiation. *Rambus Inc. v. Infineon Techs. Ag*, 318 F.3d 1081, 1088 (Fed. Cir. 2003) ("While claims often receive their interpretative context from the specification and the prosecution history, courts may not read limitations into the claims."). Otherwise, Defendants do not appear to respond to Plaintiffs' argument that their construction using "circuit" is ambiguous. *See generally* Resp. Br. Consequently, the Court adopts Plaintiffs' construction.

Accordingly, the term "controllably variable predetermined power" shall be construed as "an amount of power that is determined before it is applied, and which can be adjusted and controlled."

## IV. CONCLUSION

UPON CONSIDERATION of the briefing, the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby ORDERED AND ADJUDGED that U.S. Patent No. 6,478,453, U.S. Patent No. 6,636,003, U.S. Patent No. 7,806,558, and U.S. Patent No. 7,557,521 shall be construed as follows:

A. In U.S. Patent No. 6,478,453:

    a. The term "collimating element" is construed to mean "an optical device, such as a lens, that accepts incoming rays of light and outputs them as parallel rays of light" and the related term "collimating the light" is construed to mean "outputting rays of light as parallel rays" in Claim Thirteen; and,

    b. The term "image-forming surface" is construed to mean "a GOBO, which is an object for selectively passing light" in Claim Thirteen.

B. In U.S. Patent No. 6,636,003:

    a. The term "resultant light" shall be construed as "combined light output," and the term "color temperature" shall be construed as "the temperature, expressed in Kelvin [K], of an ideal black body radiator that radiates light of comparable hue to that of the light source" within the phrases "resultant light having a color temperature" and "the color temperature of the resultant light" in Claim One;

    b. The phrases "adjustable / adjusted between about 2500 to about 5000 degrees Kelvin" and "adjustable / adjusted to about 3600 degrees Kelvin" shall be construed according to their plain and ordinary meanings; and,

    c.   The term "chip-on-board LED" shall be construed to mean "an LED that is mounted and wire bonded directly to a printed circuit board, and covered by an encapsulant."

C.  In U.S. Patent No. 7,806,558, the term "chip-on-board assembly" shall be construed to mean "one or more semiconductor chips in which one or more LED junctions are fabricated, the chips being mounted and wire bonded to a printed circuit board."

D.  In U.S. Patent No. 7,557,521, the phrase "controllably variable predetermined power" shall be construed to mean "an amount of power that is determined before it is applied, and which can be adjusted and controlled."

It is further ORDERED that within thirty (30) days of the entry of this claim construction ruling, the Parties shall file a further joint case management status report, pursuant to Section II.8 of the Court's Patent Pretrial Order (ECF No. 11).

DONE AND ORDERED in Chambers at Miami, Florida this _4th_ day of August, 2022.


_____
K. MICHAEL MOORE
UNITED STATES DISTRICT JUDGE

c:      All counsel of record